UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLIE THOMAS,

Plaintiff,

v.

Case No. 25-cv-10153
Hon. Matthew F. Leitman

ACTABL SERVICES, LLC,

Defendant.

______________________________________/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 12)**

In this civil action, Plaintiff Kellie Thomas alleges that her former employer, Actabl Services, LLC, (1) subjected her to a hostile work environment based upon her age and race and (2) terminated her employment based upon her age and race and in retaliation for her opposition to alleged discrimination. (*See* Compl., ECF No. 1.) She brings claims against Actabl under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2201 *et seq*. (the "ELCRA"). (*See id*.) Actabl has now moved for summary judgment. (*See* Mot., ECF No. 12.) For the reasons explained below, Actabl's motion is **GRANTED**.

**I**

The parties included detailed factual recitations in their respective briefs. (*See id.*; *see also* Resp., ECF No. 13.) The Court sets forth here only those facts that are essential to a determination of Actabl's motion. Where necessary, the Court supplies additional factual background in its legal analysis below.

**A**

Thomas is a fifty-seven-year-old African American woman. (*See* Pl.'s Dep. at 16, 66, ECF No. 12-3, PageID.122, 135; Compl., at ¶ 7, ECF No. 1, PageID.3.) Actabl is a hotel software company, employing more than 300 people. (*See* Mot., ECF No. 12, PageID.82.)

Thomas began working at Actabl in October of 2022 in the company's human resources department. (*See* Pl.'s Dep. at 139, ECF No. 12-3, PageID.153.) Actabl refers to that department as the "People Team." (*Id.* at 40-41, PageID.128.)

Thomas held the role of Director of Talent Acquisition on the People Team. (*See id*. at 139-140, PageID.153.) Her job duties included "direct[ing], organiz[ing], plan[ning] and develop[ing] the implementation and administration of talent acquisition strategies and associated functions that align with the organization's strategy, brand and current and future talent acquisition needs." (Job Description, ECF No. 12-6, PageID.227.) As the Director of Talent Acquisition, Thomas reported to the head of the People Team. (*See* Pl.'s Dep. at 196-197, ECF No. 12-3,

PageID.171.) When Thomas first started with Actabl, Scott Morris was the head of that team. (*See id.*) Erica Peterson took over that role in August of 2023. (*See id.*)

When Peterson assumed that position, there were eight employees on the team. (*See* Peterson Decl. at ¶ 3, ECF No. 12-5, PageID.219-220.) Three of those employees – Thomas, Mike Gerrard, and Madelyn Rowland – served at the Director level. (*See id.*) Gerrard, an African American man, was the Director of People Operations. (*See id.*) His responsibilities included overseeing "employee relations, policy development, and performance coaching." (*Id.*) Rowland served as the Director of Talent Development. (*See id.*, PageID.220.) She was "responsible for training, performance development and engagement." (*Id.*)

In the middle of 2024, Peterson "began to assess the overall structure and efficiencies of the People [T]eam." (*Id.* at ¶ 7, PageID.221.) She concluded that the Team "was top heavy with three Directors" and that "the operational departments were confused about which People Team Director to go to for which issue." (*Id.*) Based on these findings, Peterson determined Actabl would be better served by a "Business Partner model." (*Id.* at ¶ 8, PageID.221.) Under that model, each Director on the People Team would be assigned to work with specific departments in the company. (*See id.*) And each Director would perform a full range of human resources functions for the departments to which they were assigned. (*See id.*)

Peterson further determined that under the Business Partner model, the People Team would need only two Director-level employees. (*See id*.) She therefore had to determine which Director-level position to eliminate. She ultimately chose to eliminate Thomas' Director of Talent Acquisition position and to retain Gerrard and Rowland at the Director level. (*See id*.) Peterson explained that several factors went into that decision:

> Given the level and quality of the work already being done by People Team recruiter Demetrius Moore, I determined that it made sense to eliminate Thomas's Talent Acquisition position. With a recruiting system already in place, there was no longer a need for a Director-level position for Talent Acquisition.
>
> I also concluded that it made sense to retain Mr. Gerrard and Ms. Rowland as the two Directors, because each could provide a full range of HR services (not simply recruiting) to the various departments. Both had significant HR experience, and Ms. Rowland had previously worked in one of the companies that had merged to create Actabl, in departments that she now would be supporting as a Director of People.

(*Id.* at ¶¶ 8-9, PageID.221-222.)

On October 29, 2024, Peterson met with Thomas and told her that her position had been eliminated. (*See id*. at ¶ 11, PageID.222.) Thomas therefore worked for Actabl for two years – from October 2022 through October 2024.

After Thomas' position was eliminated, the People Team made the switch to the Business Partner model. With the implementation of that model, Gerrard and

Rowland were assigned to work within specific departments within the company. (*See id*. at ¶ 12, PageID.222-223.) Actabl also hired one additional human resources employee, Rachel Parks, to assist with recruiting functions. (*See id*., PageID.223.) Parks was not hired at the Director level; her position of Talent Partner was subordinate to that level. (*See id*.) Parks was the only new employee added to the People Team in the aftermath of Thomas' separation from the company. (*See id*.)

Before Thomas' position at Actabl was eliminated, she had what she perceived as several negative interactions with fellow employees. (*See*, *e.g.*, Compl., at ¶ 8, ECF No. 1, PageID.3.) She says that her colleagues made "offensive comments about her age and race" and that they thereby "creat[ed] a hostile and offensive work environment." (*Id*.) On several occasions, Thomas reported to her superiors the comments that she found offensive. (*See, e.g.*, Pl.'s Dep. at 66-67, 95, 263-267, ECF No. 12-2, PageID.135, 142, 188-189.) The Court will provide additional details about the comments at issue in its analysis below.

**B**

On January 16, 2025, Thomas filed this action against Actabl. (*See* Compl., ECF No. 1.) The Complaint contains the following four Counts:

- Count I – "Racial Discrimination and Harassment in Violation of 42 U.S.C. §1981." In this claim arising under federal law, Thomas alleges that Actabl

subjected her to a hostile work environment based upon her race and terminated her employment based upon her race.

- Count II – "Race and National Origin Discrimination and Harassment in Violation of [the ELCRA]." In this claim arising under state law, Thomas alleges that Actabl subjected her to a hostile work environment based upon her race and terminated her employment based upon her race.
- Count III – "Age Discrimination." In this claim (which is brought only under state law), Thomas alleges that Actabl subjected her to a hostile work environment based upon her age and terminated her employment based upon her age.
- Count IV – "Retaliation." In this claim, brought under federal and state law, Thomas alleges that Actabl terminated her employment because she complained to her superiors that she was being discriminated against due to her age and race and that she was being subjected to a hostile work environment.

On February 27, 2026, Actabl filed its motion for summary judgment. (*See* Mot., ECF No. 12.) Thomas filed a response (*See* Resp., ECF No. 13), and Actabl filed a reply (*see* Reply, ECF No. 16). The Court held a hearing on the motion on September 10, 2026, and it is now prepared to rule on the motion.

## II

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326–27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

## III

The Court begins with all of Thomas' claims challenging the lawfulness of her termination: namely, her claims that she was fired based upon her age and race and that she was fired in retaliation for reporting unlawful discrimination. The Court offers a single analysis of these claims because, as explained in detail below, they

all fail for the same reason: Thomas has failed to show that Actabl's stated reason for terminating her employment was pretextual.[1]

**A**

The Court's first task is to determine the proper analytical framework to apply to Actabl's attack on the termination-based claims. That determination is driven by the type of evidence that Thomas has offered in support of her claims. Since Thomas relies exclusively upon indirect (or circumstantial) evidence of both discrimination and retaliation, the Court applies the familiar three-step *McDonnell Douglas* burden-shifting framework when determining whether her claims survive summary judgment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Pannek v. U.S. Bank Nat'l Ass'n*, 186 F.4th 382, 391 (6th Cir. 2026) (evaluating claims "under the burden-shifting framework of *McDonnell Douglas*" where plaintiff relied "on circumstantial evidence.").

---

[1] Even though Thomas' termination-based claims arise under both federal and state law, it is appropriate to analyze them together because, as counsel for Thomas and Actabl acknowledged at the hearing on Actabl's motion, the applicable state and federal standards are the same. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (noting in case where plaintiff brought discrimination claims under Title VII, the ELCRA, and Section 1981 that "[a]ll of [plaintiff's] discrimination claims are subject to the same burden-shifting standard"); *Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) ("The elements of a *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981.") (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000)); *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021) (applying the same standard to the plaintiff's retaliation claims "under both Title VII and ELCRA.").

"Under that framework, [Thomas] carries the initial burden of establishing a *prima facie* case of discrimination or retaliation." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020). If Thomas satisfies that burden, "the burden then shifts to [Actabl], who must 'articulate some legitimate, non-discriminatory [and non-retaliatory] reason for [its] actions.'" *Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). "But even if [Actabl] do[es] articulate such a reason, [Thomas] can still win by 'demonstrate[ing] that [Actabl's] proffered reason was not the true reason for the employment decision,' which would suggest that it was merely a pretext for discrimination [or retaliation]." *Id.* (quoting *Laster*, 746 F.3d at 730).

Thomas counters that the Court should not apply the *McDonnell Douglas* framework because it was "created by the Courts setting standards that the legislature refused to create." (Resp., ECF No. 13, PageID.340-343.) Thomas supports this argument with a citation to a concurring Opinion by Justice Clarence Thomas. (*See id.*, PageID.340, citing *Ames v. Ohio Dep't of Youth Svcs.*, 603 U.S. 303, 313-326 (Thomas, J., concurring).) While the argument is thought-provoking, it is a non-starter at this level. This Court is, of course, bound to follow the Supreme Court's decision in *McDonnell Douglas* and the Sixth Circuit caselaw mandating application of the *McDonnell Douglas* framework.

**B**

The Court assumes *arguendo* that Thomas can establish a *prima facie* case of discrimination and retaliation, and because Actabl has offered a legitimate reason for her termination – *i.e.*, that it terminated her employment because it eliminated her position as part of a restructuring – the Court will proceed directly to the pretext stage of the *McDonnell Douglas* framework. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009) (explaining that "[w]e need not address whether [the plaintiff] established a *prima facie* case of retaliation" where "she has failed to create a genuine issue of material fact as to pretext"). Thomas' claims challenging the termination of her employment all fail at that stage because she has not presented sufficient evidence that Actabl's stated reason for her termination was a pretext for discrimination or retaliation.

"Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Thomas relies on the "no basis in fact" option for proving pretext.[2] (*See*

[2] In her response, Thomas says that the Court should find pretext on the additional basis that Actabl's stated reason "was insufficient to warrant her termination." (Resp., ECF No. 13, PageID.344.) But she does not develop or attempt to support that theory of pretext. The Court therefore will only address the "no basis in fact" theory because it was the only theory Thomas actually presents in her response.

Resp., ECF No. 13, PageID.344.) For the reasons explained below, none of Thomas' arguments persuade the court that her firing was pretextual.

**1**

First, Thomas claims that Actabl terminated her employment because Peterson "grew tired of having to address [Thomas'] concerns" about "age and race discrimination and harassment," rather than, as Actabl claims, because Thomas' position was eliminated. (Resp., ECF No. 13, PageID.344-345.) But Thomas has not cited any evidence in the record supporting her allegation that Peterson was "tired" of addressing her concerns. (*Id.*) And the only evidence concerning Peterson's response to Thomas raising concerns is to the contrary. For example, Thomas testified that Peterson did *not* seem upset when Thomas raised concerns about a lack of diversity among Actabl's leadership. (*See* Pl.'s Dep. at 284-285, ECF No. 12-3, PageID.193.) Other portions of Thomas' testimony suggest that Peterson was actually receptive to her (Thomas') diversity-related concerns and at times even agreed with them. Thomas testified that Peterson "acknowledged" a lack of diversity and expressed "disappointment[]" with Actabl's selection of a "new [non-diverse] COO" because the company "had a chance to actually really show some diversity in the C-suite." (*Id.* at 284, PageID.193)

In sum, Thomas offers nothing more than her "mere personal beliefs, conjecture and speculation" to support her theory that Peterson eliminated her

(Thomas') position because Peterson was tired of hearing Thomas complain about discrimination. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (cleaned up). That does not suffice to carry her burden at the pretext stage.

**2**

Thomas further claims that there is at least a question of fact as to whether Actabl actually eliminated Thomas' Director-level position – and thus whether the claimed elimination was the true reason for her termination. In support of that contention, Thomas says that after Actabl fired her, it "hire[d] three new people to fill the holes left by [her] termination." (Resp., ECF No. 13, PageID.345.) According to Thomas, "[t]here are serious questions of fact to [sic] answered by a jury as to whether Ms. Peterson truly believed that it was a good business decision to take on three new salaries, benefits and resources to replace [Thomas], or whether these steps were taken in response to [Thomas'] continued complaints on discrimination and harassment." (*Id.*) There are at least two flaws in this argument.

First, the undisputed evidence shows that after Thomas' position was eliminated, Actabl hired only *one* new employee, Rachel Parks, to perform recruiting functions. (*See* Peterson Decl. at ¶¶ 12-13, ECF No. 12-5, PageID.223.) While Actabl originally considered adding three new employees to the People Team as part of the restructuring implemented by Peterson (*see* ECF No. 12-18, PageID.284),

Thomas has not cited any evidence that Actabl actually hired any new employees other than Parks on the People Team.

Second (and more importantly), Parks was not hired at the Director level. Instead, she was hired at the lower level of Talent Partner, a position that is "a level subordinate to Directors and reports to Directors." (Peterson Decl. at ¶ 12, ECF No. 12-5, PageID.223.) Thus, neither Parks nor any other employee was "hired to replace Ms. Thomas as Director of Talent Acquisitions." (*Id.*) The fact that some of Thomas' recruiting duties may have been shifted to Parks at her lower-level position does not suggest that Thomas' higher-level position remained intact. Simply put, Thomas has not presented any evidence that calls into question Actabl's contention that it terminated Thomas' employment because it eliminated the Director-level position that she held.

**3**

For all of the reasons explained above, Thomas has failed to create a material dispute of fact as to whether Actabl's stated reason for terminating her employment was a pretext for discrimination or retaliation. Actabl is therefore entitled to summary judgment on all of Thomas' claims challenging her termination.[3]

---

[3] Actabl argues that it is entitled to summary judgment on the termination-based claims for other reasons. The Court need not and does not reach Actabl's additional arguments.

## III

The Court next turns to Thomas' claims that she was subjected to a hostile work environment based upon her age and race. The Court concludes that Actabl is entitled to summary judgment on these claims.

### A

To prevail on a hostile work environment claim, Thomas must establish that:

> (1) [she] belongs to a protected class; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on [a protected category]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action.

*Khalaf v. Ford Motor Co.*, 973 F.3d 469, 472 (6th Cir. 2020) (cleaned up) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)).[4] "When evaluating these claims ... [courts] look[ ] at the totality of the alleged harassment to determine whether it was sufficiently severe or pervasive to alter the conditions of a plaintiff's employment and create an abusive working environment." *Id*. (cleaned up). "Relevant circumstances 'may include the frequency of the discriminatory conduct;

[4] The cases cited above state this standard as applied "under Title VII or the ELCRA." *Khalaf*, 973 F.3d at 472. Here, Thomas sues under Section 1981, rather than Title VII. The Sixth Circuit has explained, however, that the same test applies to claims under Section 1981. *See Williams v. CSX Transp. Co.*, 643 F.3d 504, 511 at n.4 (6th Cir. 2011) ("This five-element test is usually posited for claims brought under Title VII, but we apply the same test to claims, as here, brought under § 1981.").

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009) (quoting *Mayville v. Ford Motor Co.*, 2006 WL 3040672, at *3 (Mich. Ct. App. Oct. 26, 2006)). The allegedly-harassing conduct at issue "must be judged by both an objective and subjective standard." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998) (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)).

The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Khalaf*, 973 F.3d at 482 (quoting *Phillips*, 854 F.3d at 328). "For example, in the context of alleged racial discrimination, [the Sixth Circuit] has determined that 'even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements.'" *Id.* (quoting *Phillips*, 854 F.3d at 328). And generally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

While the Sixth Circuit has said that the question of "whether conduct is severe or pervasive is quintessentially a question of fact," *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (internal citation omitted), it has nonetheless regularly "affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (affirming summary judgment in favor of defendant on hostile work environment claim and collecting cases doing the same).[5]

Notwithstanding this settled body of Sixth Circuit law, Thomas contends that the Court should not apply "the severe [or] pervasive standard" when "deciding [Actabl's] motion for summary judgment" because that standard "is not in Title VII." (Resp., ECF No. 13, PageID.342.) Thomas supports this argument by citing a question posed by Justice Neil Gorsuch during a Supreme Court oral argument. (*See id*.) While this argument is a serious one, the Court cannot accept it. The Court is bound to follow the long line of published Sixth Circuit decisions formulating and applying the severe or pervasive test as described above. And under that test, Thomas' hostile work environment claims fail as a matter of law.

[5] *See also Kellar v. Yunion, Inc.*, 157 F.4th 855, 875 (6th Cir. 2025) (finding hostile work environment claim failed as a matter of law); *Amini v. Rite Aid Corp.,* 819 F. App'x 344, 350 (6th Cir. 2020) (same); *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 570 (6th Cir. 2021) (same).

**B**

The Court first addresses Thomas' age-based hostile work environment claim. This claim rests upon Thomas' contention that "[t]hroughout her employment" and "on a regular basis," she was subjected to "offensive comments about her age." (Compl. at ¶ 64, ECF No. 1, PageID.12.) But in her response to Actabl's motion, Thomas does not even come close to showing that she was subject to age-related comments "on a regular basis." Indeed, her response cites a mere two pages of her deposition testimony concerning age-related statements, and those pages (together with nearby pages not cited by Thomas) recount, at most, a handful of age-related comments.[6] (*See* Resp., ECF No. 13, PageID.327, citing Pl.'s Dep. at 255-256, ECF No. 12-3, PageID.186.) The response also cites testimony from another witness on the age issue, but in the cited testimony, that witness recounted Thomas' complaints

[6] Importantly, the Court has no obligation to search through Thomas' deposition testimony to determine whether her claims may find support in parts of that testimony that she did not cite in her response or at the hearing before the Court. *See Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992) (clarifying that a district court is not obligated to "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party" to decide a motion for summary judgment). While the Court has read Thomas' testimony, it is Thomas' obligation to cite the portions of the testimony that, she believes, create a material factual dispute precluding summary judgment. *See Anderson*, 477 U.S. at 250 (explaining that "when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial.") (cleaned up). When reviewing Thomas' race-based claims below, the Court likewise focuses primarily on the portions of the record cited by Thomas.

about only a single age-based comment made to her. (*See id*., PageID.328-329., citing Gerrard Dep. at 25-26, ECF No. 12-9, PageID.239.)

Moreover, Thomas' response offers essentially no legal argument in support of her age-based hostile work environment claim. The titles of two of the argument sections in the response mention age. The title of Argument II refers to "age discrimination," but that argument focuses exclusively on the termination of Thomas' employment and does not address her hostile work environment claim. (*See* Resp., ECF No. 13, PageID.334 (identifying the relevant "adverse action" as "being terminated").) And while the title of Argument III mentions age-based hostile working conditions, that entire section is devoted to a discussion of race-based hostility; it does not contain a single word describing age-based hostility. (*See id*., PageID.335-343.)

Simply put, Thomas' defense of her age-based hostile work environment claim falls far short of demonstrating that there is a material factual dispute on that claim. In contrast, Actabl has carefully evaluated the claim and shown that the claim fails as a matter of law because Thomas has failed to present evidence sufficient to support a finding that she was subjected to age-based harassment that was sufficiently severe or pervasive as to alter the conditions of her employment. (*See* Mot., ECF No. 12, PageID.100-101.) Actabl is therefore entitled to summary judgment on Thomas' age-based hostile work environment claim.

**C**

The Court next turns to Thomas' race-based hostile work environment claim. That claim also fails as a matter of law.

**1**

Thomas' race-based hostile work environment claim rests upon her allegations that on "a regular basis" she was the target of "offensive comments" about her race, was subject to "bull[ying]" based upon her race, and was "mirco-manag[ed]" based upon her race. (Compl. at ¶¶ 9, 16-17, ECF No. 1, PageID.3-4.) In Actabl's motion for summary judgment, Actabl catalogued the comments and conduct identified by Thomas during her deposition as supporting this claim. (*See* Mot., ECF No. 12, PageID.96-97.) In Thomas' response to the motion, Thomas did not cite any evidence that undermines the accuracy and/or completeness of Actabl's list of allegedly-hostile acts. Thomas' counsel likewise did not point to any such evidence during the hearing before the Court. The Court therefore treats Actabl's listing of allegedly-hostile statements and acts as fair and full and will base its analysis of Thomas' race-based hostile work environment claim upon Actabl's list.

As set forth by Actabl, Thomas identified the following as exhibiting race-based hostility towards her:

- During a January 2023 [video] conference, Jason Luo, [the chief revenue officer at Actabl,] messaged Thomas asking whether her African American subordinate was sleeping, and suggesting he turn his camera off if he was tired.

- In a follow-up call with Luo, Thomas told him that, like her subordinate, she wore glasses and was heavier, so when she looked down it might look as if she were asleep. Luo allegedly responded, "I don't even know what you are." Thomas admits she waited ten months to report this.

- Thomas's supervisor, COO Rob Ryan, responded to a complaint from Luo that Thomas had corrected him about reference check protocol by suggesting that Thomas not be "so professional."

- In November 2023, a co-worker messaged Thomas that "your hair looks amazing by the way" when Thomas wore her hair straight, and in a later telephone call allegedly said that Thomas's hair looked more professional that way. Thomas emailed the co-worker to tell her that such a comment was insulting; the co-worker apologized. Thomas shared this email exchange with Peterson and told her that she did not need Peterson to do anything in response.

- Luo and the Marketing Department took recruiting actions without her approval; treated her as "subservient," overstepped her and would not allow her to do her job, and believed she was incapable.

- In October 2024, Kenza Sebbar micromanaged her and was disrespectful.

- When Thomas dyed her hair blonde, another co-worker allegedly asked "Why would you do that? What are you trying to be?" Thomas did not report this.

- Another co-worker allegedly asked about a new hairdo worn by Thomas: "that's different," "are those dreads or braids?" Thomas claims to have reported this to Gerrard.

- Told that Thomas had a sunburn, a co-worker allegedly said, "I don't believe that your burn" and "You are really fair. Who on your side is White?" [Pl. 263, 290] Thomas did not report this.

- After Thomas told a co-worker that her family was Native American, the worker allegedly said, in surprise, that she did not believe her. Thomas claims to have reported this to Gerrard, and it did not recur.

(Mot., ECF No. 12, PageID.96-97; internal citations omitted.)

**2**

While Thomas may have subjectively perceived all of the allegedly-harassing conduct listed above to have been based upon her race, there is a real question as to whether Thomas has satisfied her burden to show, on an objective basis, that at least some of the conduct identified above was race-based.[7] *See Abeita*, 159 F.3d at 251 (explaining conduct is judged both objectively and subjectively).

For instance, Thomas offers no evidence that Rob Ryan's request that she not be "so professional" when correcting her colleagues had anything to do with her race. And the context of that statement suggests that it did not. According to Thomas, Ryan made this suggestion after Luo had complained that Thomas called

[7] Thomas argues at some length that the Court should treat the comments concerning her hair as race-based. (*See* Resp., ECF No. 13, PageID.337-339.) The Court agrees that for purposes of the pending motion (and when the evidence is viewed in the light most favorable to Thomas), the comments concerning Thomas' hair should be regarded as racially offensive comments. *See* Leath *v. Collins*, 2026 WL 228827, at * 5 (6th Cir. Jan. 28, 2026) (noting that "references to a Black employee's hair … could be discriminatory").

Luo out for not following protocol. (*See* Pl.'s Dep. at 47-57, ECF No. 12-3, PageID.130-132.) The context suggests that Ryan's comment was not motivated by racial animus, but it instead was a response to ordinary interpersonal tension among colleagues.

Thomas likewise failed to connect Sebbar's alleged micromanaging to racial hostility. Thomas does not cite any proof that Sebbar harbored any racial animus or that Sebbar's management style was connected in any way to Thomas' race. (*See id*. at 285-289, PageID.193-194.)

Finally, Thomas does not cite any evidence that Luo's question about whether her African-American colleague was sleeping during a video conference was tied to that colleague's race. And the evidence suggests that she did not interpret the question as race-related when she heard it. (*See id*. at 186-187, PageID.169.) Instead, at that time, she seemed to acknowledge the legitimacy of Luo's question as to whether the colleague was sleeping, and she appeared to offer an explanation to Luo as to why the colleague could have been perceived as sleeping. She said to Luo: "I will speak with [the colleague]. It looked like he was working on something else." (*Id*. at 186, PageID.169.) In short, substantial portions of the conduct underlying Thomas' race-based hostile work environment claim do not appear to be race-based.

**3**

But even assuming *arguendo* that all of the allegedly-hostile conduct listed above was race-based, Thomas' claim still fails because she has not shown how a jury could reasonably find that that conduct, in its entirety, was sufficiently severe or pervasive as to alter the conditions of her employment. As noted above, the Sixth Circuit considers several factors when evaluating whether alleged harassment qualifies as severe or pervasive. These factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Betts,* 558 F.3d at 468. Here, these factors all weigh against a finding that the alleged harassment here was severe or pervasive.

First, Thomas has not shown that she was frequently harassed. She stresses that she "identified at least 10 incidents [of harassment] over a two year period" (Resp., ECF No. 13, PageID.340), but she fails to cite a single decision finding a similar frequency of harassment to be pervasive. Instead, she cites two cases in which the Sixth Circuit found that a *lesser* amount of harassment did *not* rise to the level of a hostile work environment, and she stresses that she experienced more harassment than the plaintiffs in those cases. (*See* Resp., ECF No. 13, PageID.339, citing *Phillips v. UAW Int'l*, 854 F.3d 323 (6th Cir. 2017) (involving four offensive comments over two years) and *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341 (6th

Cir. 2005) (involving three offensive acts over two and one-half years).) But *Phillips* and *Clark* do not stand for the proposition that any level of harassment greater than that experienced by the plaintiffs in those cases would necessarily qualify as frequent and/or pervasive. *Phillips* and *Clark* simply do not speak to the level of harassment that Thomas claims to have experienced. But other Sixth Circuit case law does. And those decisions suggest that the alleged harassment she described was not frequent enough to be pervasive. *See Nathan v. Great Lakes Water Auth.,* 992 F.3d 557, 568 (6th Cir. 2021) (explaining that Sixth Circuit had previously decided that "fifteen incidents of mostly 'offensive utterances' over a two-year period were not severe or pervasive") (quoting *Clay*, 501 F.3d at 708, 715).

Second, Thomas has failed to show that the alleged harassment was severe. Thomas does not contend that the alleged harassment was physically threatening. And while she does suggest that the comments were embarrassing, many of them appear to have been made in a "one on one" setting, "and the lack of an audience for these personal remarks reduces their humiliating nature." *Nathan,* 992 F.3d at 570. Simply put, most of the alleged harassment identified by Thomas consisted of offensive utterances, and those utterances – while wholly inappropriate – fall short of the "relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips*, 854 F.3d at 328.

Finally, Thomas does not cite in her response any evidence that the alleged race-based harassment meaningfully interfered with her ability to perform her job. She simply asserts, without any citation to the record, that "the harassment substantially interfered with [her] ability to do her job." (Resp., ECF No. 13, PageID.340.) But as Actabl notes, Thomas testified contrary to that assertion. She said that she was able to "perform[]" her "job well" despite the alleged harassment. (Pl.'s Dep. at 294, ECF No. 12-3, PageID.196.)

Under all of these circumstances, Actabl is entitled to judgment as a matter of law on Thomas' race-based hostile work environment claim.

**IV**

For all of the reasons explained above, Actabl's motion for summary judgment (ECF No. 12) is **GRANTED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: September 29, 2026

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 29, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126